**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Western Home Transport, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING MOTION TO DISMISS ON RULE 19 GROUNDS** |
| | ) | **AND DENYING MOTION FOR** |
| vs. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Hexco, LLC d/b/a/ HC Company, | ) | |
| | ) | Case No. 4:13-cv-076 |
| Defendant. | ) | |

Before the court are pending motions by plaintiff Western Home Transport, Inc. ("Western")

for summary judgment and defendant Hexco, LLC, doing business as HC Company ("Hexco") to

dismiss for failure to join an indispensable party. The court held a telephonic hearing on the motions

on April 25, 2014. The facts are either uncontested or stated most favorably for Hexco.

## I.     BACKGROUND

In October 2011, Hexco obtained a quote from Stone Creek Homes, Inc. ("Stone Creek") to

acquire six modular homes for delivery to Hexco's project site in Williston, North Dakota. The total

cost for the six units according to the quote letter originated by Stone Creek was $571,752.00, which

included $7,000.00 per modular home for transport FOB Williston. (Doc. No. 25-3).

While the facts are somewhat sketchy, it appears Hexco decided to finance the acquisition

of the modular units using lease-purchase financing. On October 31, 2011, Hexco signed a lease-

purchase agreement with Midwest Leasing, Inc. ("Midwest Leasing") that was accepted on

November 7, 2011. (Doc. No. 37-1). Also, on November 7, Stone Creek invoiced Midwest Leasing

the sum of $285,876.00 towards the purchase of the homes, and Midwest Leasing wire-transferred

the money to Stone Creek. The invoice reflected that the $285,876.00 was ½ of the total purchase

1

price of $571,752.00. In addition, Stone Creek's invoice provided a breakdown of what was included in the total purchase price consistent with the quote it had provided earlier to Hexco. Relevant here is the fact that the breakdown of the total purchase price included transport charges of $7,000.00 per unit for a total of $42,000.00. (Doc. No. 25-2).

Midwest Leasing paid Stone Creek the remaining amount due on the total purchase price by wire transfers of $228,700.80 on February 14, 2012, and $57,175.20 on April 2, 2012. Midwest Leasing stated that Stone Creek required the final payments before it would ship the modular homes. Midwest Leasing states in an affidavit that the cost for transportation was Stone Creek's obligation, consistent with its invoice. (Doc. No. 37).

Western is a corporation that specializes in over-the-road transport of modular and manufactured homes and, as already noted, is the plaintiff in this action. Western claims that it transported five of the modular homes from a location in Central City, Nebraska to Hexco's project site in Williston, North Dakota on various dates beginning in late March 2012, with the last home delivered in the later part of May 2012. (Doc. No. 22, ¶ 3). Western claims its shipping charge for each of the homes was $15,855.00, that none of the charges have been paid, and that it is now owed $79,275.00 plus prejudgment interest. (Doc. No. 22).[1]

To support its claim, Western has proffered for each of the modular homes it claims to have transported a document entitled "Freight Bill and Bill of Lading" (herein "bill" or "bill of lading"). It appears Western originated the five bills of lading because they contain Western's logo and other

---

[1] The record is silent as to who transported the sixth modular home, when it was transported relative to the others, who paid the transportation charge, and the amount of the transportation charge.

2

company-specific information. For one of the bills, Western provided only an unsigned copy. For the other four, there is both an unsigned copy and a fully executed copy. (Doc. Nos. 23-1 to 23-5).

Each of the bills of lading identified Stone Creek as the shipper and payor and Hexco (referred to as HC-Company) as the consignee. Each of the bills had a section that was filled in with the following printed information:

| Shipper's Name | STONE CREEK HOMES | City | State | Zip | Cust Code 1761 | Amount to Bill Shipper |
|---|---|---|---|---|---|---|
| Shipper's Address | 1201 W. MARKLEY RD | PLYMOUTH | IN | 46563 | | |
| Consignee's Name | HC-COMPANY | City | State | Zip | Cust Code 1307 | To collect from Consignee |
| Consignee's Address | 13481 60TH ST N.W. | WILLISTON | ND | 58801 | | |
| Payor's Name | STONE CREEK HOMES | City | State | Zip | Cust Code 1711 | Amount to bill payor |
| Payor's Address | 913 N 17TH AVE | CENTRAL CITY | NE | 68826 | | $15,855.00 |

Why Hexco and not Midwest Leasing was listed as the consignee is not entirely clear, but it may reflect the reality of its lease simply being a financing mechanism. Also, unclear is how the $15,855.00 shipping charge was arrived at. Hexco denies any involvement with or responsibility for the shipping and professes not to know, and most likely this was something that Stone Creek arranged with Western. In any event, the shipping charge of $15,855.00 set forth in the bills of lading was more than twice the amount that Stone Creek included as part of the purchase price. Finally, and perhaps most significantly with respect to the discussion that follows, the space entitled to "To collect from Consignee" in the foregoing matrix was left blank in each of the five bills and the space entitled "Amount to bill payor" (*i.e.*, Stone Creek) was filled in with the amount of Western's transportation charge.

Immediately below the above section, there appears in the bills of lading the following:

| Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the shipper, the shipper shall sign the following statement: the carrier shall not make delivery of this shipment without payment of freight and all other lawful charges<br><br>Shipper Sign Here: | Collect Prepaid Charge |
|---|---|
| Collect on Delivery $ And Remit to | Purchase Order |
| Street City State | 08-*** |

In each of the bills, the Shipper did not sign in the space provided and the box where the words "Collect," "Prepaid Charge," or perhaps "Collect Prepaid Charge" (the printed language is unclear as to how the bills are to be read) was left blank. The words "Purchase Order" were printed in the box immediately below in each of the bills, and what this relates to is not explained. In the next box in the same column, there appears a number in each of the bills beginning with "08" that most likely was Stone Creek's serial number for the homes based on other documents in the record.

There next appears in each of the bills information about the load. In a column labeled "tariff," the letters "ICC" have been inserted. On its face, this does not make sense since the ICC was abolished and replaced by the Surface Transportation Board with the passage by Congress of the Interstate Commerce Commission Termination Act ("ICCTA") in 1995. Also, the ICCTA substantially deregulated the motor carrier industry by eliminating tariff-filing requirements for motor carriers except for the transportation of household goods and goods moved by or with the assistance of a water carrier in noncontiguous domestic travel, neither of which appears to be applicable here. See Transit Homes of America, Div. of Morgan Drive Away, Inc. v. Homes of Legend, Inc., 173 F. Supp. 2d 1185, 1188-90 (N.D. Ala. 2001) (discussing the 1995 deregulation and observing that the carrier made no claim that the manufactured homes transported in that case were the subject of the ICCTA's limited tariff requirements); 49 U.S.C. ch. 137. Western's

affidavits and briefs filed in support of its motion for summary judgment are notably silent on whether Western's freight charges are the subject of a federally-established tariff.

In the column next to that provided for the tariff, there is space to fill in the mileage. In each of the bills of lading, the number 1750 has been inserted. This appears to be roughly twice the actual mileage between the place from where the transport originated in Central City, Nebraska to Hexco's site in Williston, North Dakota. But, whether this has anything to do with the amount of Western's freight charge and, if so, whether it is properly calculated on the total mileage operated by Western's truck as opposed to the mileage of the transported modular home is not explained.

Each of the five bills contained a statement "PAYOR IS LIABLE FOR ALL TIRES, TUBES, MECHANICAL FAILURES AND/OR STRUCTURAL DEFECTS" just above the space provided for signature. The possible significance of this is discussed later. Finally, each of the bills has a space at the bottom for signatures as follows:

| I hereby make the declarations of value (if any) and agree to the foregoing contract terms and conditions<br><br>SHIPPER SIGN HERE | Date |
|---|---|
| Foregoing shipment received subject to declaration (if any) or release terms and conditions herein.<br>WESTERN HOME TRANSPORT, INC.<br><br>DRIVER OR AGENT<br>SIGNATURE | Date<br><br>NO PERSONAL CHECKS ACCEPTED |
| RECEIVED the above described property in good condition except as noted above and agree to the foregoing contract terms and conditions.<br><br>CONSIGNEE OR AGENT<br>SIGN AT DELIVERY     Notes:_____<br>POINT (Sign here) | Date<br>Time<br><br>    AM       PM |

(Doc. Nos. 23-1 to 23-5). Notably, Western's form appears to authorize the driver to execute the bill of lading on its behalf.

For the four bills for which Western tendered a fully-executed copy, there appear signatures which, purportedly, are on behalf of the shipper (*i.e.*, Stone Creek) and Western. In the space for the signature of the consignee or its agent, Hexco states that two of the four bills were signed by Ted McConnachie, who was an employee of Hexco at the site. McConnachie states in an affidavit he was under the impression after reading the bills that Stone Creek was responsible for the shipping charges. He states that the driver who delivered the homes told him the same thing and asked that he sign the bills only to acknowledge delivery. McConnachie also recalls the driver telling him that he had to stop for a couple of days while in transit while Western worked out arrangements with Stone Creek for payment. (Doc. No. 27). Hexco's Vice President states he does not recognize the signatures on the other two fully-executed bills that Western tendered, and Hexco puts Western to its proof that these bills of lading, as well as the one for which Western has tendered only an unsigned copy, were signed by Hexco. (Doc. No. 26).

## II.    MOTION FOR SUMMARY JUDGMENT

### A.    Summary judgment standard

The standards for addressing motions for summary judgment are well known to the court and need not be repeated here. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Barnhardt v. Open Harvest Co-op., 742 F.3d 365, 369 (8th Cir. 2014).

### B.    Discussion

#### 1.    Introduction

Western contends that Hexco became liable for the freight charges set forth in its bills of lading upon acceptance of the modular homes. Western makes two arguments for why Hexco is liable. The first is its contention that bills of lading are uniform documents prescribed by Congress

pursuant to which a consignee is always liable for the freight charges - at least absent the bills being marked prepaid. The second is that a consignee in a bill of lading for goods shipped in interstate commerce becomes liable upon acceptance of the freight as a matter of federal common law.[2]

Notably, Western has not made a contract-based argument for liability, *i.e.*, an argument based on the actual language of the bills of lading. Also, Western has not moved for summary judgment on its claim for unjust enrichment, which is another theory of liability pled in its complaint. Consequently, the court will only address the two arguments that Western has made.[3]

> ### 2. Western's argument that the bills of lading it used are uniform documents prescribed by Congress that impose liability upon a consignee upon acceptance of the freight

Western opens its argument for Hexco's liability by asserting that "[b]ills of lading are uniform documents prescribed by Congress that govern the rights of parties to an interstate shipping agreement," citing Illinois Steel Co. v. Baltimore & O. R. Co., 320 U.S. 508 (1944) ("Illinois Steel"). While that may have been true for the bills of lading involved in Illinois Steel, since the

---

[2] Western has not cited any federal statute or regulation that imposes liability on a consignee in this instance.

[3] If North Dakota law is applied to Western's claim of unjust enrichment, Western must prove: "(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) the absence of a justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law." E.g., McColl Farms, LLC v. Pflaum, 2013 ND 169, ¶ 18, 837 N.W.2d 359. Arguably, to prove impoverishment, Western will be required to prove the reasonableness of its transportation charge. See Canadian Nat. Ry. v. Vertis, Inc., 811 F. Supp. 2d 1028, 1033 (D.N.J. 2011). Further, if Western agreed to look only to Stone Creek for payment, it may have difficulty satisfying the element requiring that there be an absence of justification for the impoverishment. See id. at 1034-35. Finally, to the extent that Hexco can demonstrate that it paid or will pay under its lease the transportation charge, it may have an argument that it was not enriched - at least to the extent of the amount it paid or will pay if less than a reasonable charge. See id.; cf. Jackson Rapid Delivery Serv., Inc. v. Thomson Consumer Electronics, Inc., 210 F. Supp. 2d 949, 954-55 (N.D. Ill. 2001) (holding that a consignor who had paid his shipping agent the amount of the freight charge was not enriched for purposes of an unjust enrichment claim asserted against it by the carrier).

ICC had at that time established a uniform bill of lading for use by railroads, it simply is not true for all bills of lading used in interstate commerce.

A bill of lading is a commercial document that may be used for several purposes. It may serve as a document of title for the transported goods. It may function as receipt evidencing the transfer of possession of the goods from the shipper/consignor to the carrier, including documenting the kind and quantity of the goods and, in some instances, their condition. Finally, and more importantly here, the bill of lading is usually the basic transportation document between a shipper (who is often but not always the consignor) and the carrier and, absent something more, is the primary contract between the two. See generally 1-2 Goods in Transit § 2.01 (LexisNexis 2014) ("Goods in Transit"). The liability of the consignee designated in a bill of lading is a much more complicated subject and is not necessarily governed by the bill of lading. See generally 4-22 Goods in Transit §§ 22.03 - 22.04.

Bills of lading used in interstate commerce by common carriers are subject to the federal Bills of Lading Act codified at 49 U.S.C. § 80101 et seq. Notably, this Act does not require the use of a uniform bill of lading. See id. In fact, its primary purpose is to regulate those bills of lading that are negotiable instruments. 1-2 Goods in Transit § 2.04. And, absent a particular federal statute, regulation, or, perhaps administrative decision by the Surface Transportation Board ("STB") requiring the use of a particular form of bill of lading with prescribed terms, the shipper/consignor and the carrier are free to vary the terms of their contract as they see fit with respect to liability for freight charges and reflect that either in the bill of lading, in agreements outside of the bill of lading, or both. See generally Goods in Transit §§ 2.01, 2.02, 6.00, & 22.01-22.04.

Western has not cited to any federal statute, regulation, or STB decision dictating the form of bill of lading it used - much less any authority that such form necessarily imposes liability upon consignees for the transportation charges upon acceptance of the goods regardless of the particular circumstances, including any agreement by the carrier to the contrary. In short, Western's claim of liability based on it having used a uniform bill of lading prescribed by Congress that purportedly imposes liability upon a consignee for the freight charges fails for lack of proof.

> ### 3. Western's claim of consignee liability as a matter of federal common law
>
> #### a. The <u>Fink</u> line of "filed-tariff" cases

Most of the decisions that expressly or in *dicta* state that a consignee becomes liable for freight charges upon acceptance of the freight as a matter of federal law rely upon a series of rail cases decided by the Supreme Court in the early 1900's. These cases will be referred to as the "filed-tariff" cases because rail freight rates at that time were set by tariffs approved by the ICC pursuant to the Interstate Commerce Act, the tariffs figured prominently in the decisions, and the Supreme Court has since described the cases as establishing the "filed-rate doctrine." <u>See</u>, <u>e.g.</u>, <u>Maislin Industries, U.S., Inc. v. Primary Steel, Inc.</u>, 497 U.S. 116, 126-128 (1990) ("<u>Maislin Industries</u>").

Probably, the most cited of these cases in terms of consignee liability is <u>Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink</u>, 250 U.S. 577 (1919) ("<u>Fink</u>"). In <u>Fink</u>, the carrier had collected from the consignee the amount of the freight charges specified in the waybill. However, this amount was less than the established tariff and, when the carrier discovered the error, it sued the consignee to collect the amount of the undercharge. The Court, after observing that there was a conflict at common law regarding the liability of a consignee, remarked: "The weight of

authority seems to be that the consignee is prima facie liable for the payment of the freight charges when he accepts the goods from the carrier." Id. at 580-81. The Court went on to conclude, however, that regardless of what might be the common law rule, the consignee's liability in that case arose out of the federally-established tariff. The Court concluded that the tariff provisions of the Interstate Commerce Act required full payment of the tariff in order to effectuate its purposes of uniform treatment and prevention of discrimination and favoritism by carriers. Id. at 581-82. While noting that imposing liability upon a consignee for the tariff amount might in some cases impose a hardship, the Court stated it was obliged to follow the policy established by Congress with respect to the necessity of tariff enforcement. Id. at 582. In other words, the liability that the Fink Court imposed on the consignee (who had already acquiesced to payment of the freight charge) was a species of strict statutory liability for payment of the tariff amount and, essentially, was the same liability that the Court had imposed in earlier cases on consignors, notwithstanding their agreement with the carrier for a lesser rate, including in Texas & P. Ry. Co. v. Mugg & Dryden, 202 U.S. 242 (1906). See, e.g., Maislin Industries, 497 U.S. at 126-27 (stating that the Court in Mugg and other filed-tariff cases read the federal statutes imposing tariffs "to create strict filed rate requirements and to forbid equitable defenses to collection of the filed tariff"); Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., 460 U.S. 533, 535 (1983) (federal jurisdiction existed for claim by a motor carrier to collect an unpaid tariff amount because the "carrier's claim is, of necessity, predicated on the tariff—not an understanding with the shipper.").

Two years later, under somewhat similar circumstances, the Supreme Court in New York Central & Hudson River Railroad Co. v. York & Whitney Co., 256 U.S. 406 (1921), relied upon Fink's principle of strict liability and held a consignee liable for the full amount of the tariff, noting

that a "consignee could not escape the liability imposed by law through any contract with the carrier." Id. at 408.

Then, in 1924, the Supreme Court decided Louisville & Nashville Railroad Co. v. Central Iron & Coal Co., 265 U.S. 59 (1924) ("Louisville & N.R. Co."), which principally dealt with the liability of the consignor for the payment of an undercharge but is another case sometimes relied upon for there being a common law rule that a consignee becomes liable for the freight charges upon acceptance of the goods. The facts of the case were that the carrier had collected the freight charge specified in the bill of lading from the consignee, who had agreed with the shipper/consignor to be responsible for the freight charge. Later, the carrier determined the amount it had collected was less than the tariff amount and sued the consignor/shipper for the undercharge without proceeding against the consignee. The trial court concluded that the consignor/shipper was not liable and this holding was affirmed by the court of appeals. Id. at 63-65.

In reaching the conclusion that the trial court had not erred, the Supreme Court observed that normally the liability of the consignor is primary. Id. at 67 ("Ordinarily, the person from whom the goods are received for shipment assumes the obligation to pay the freight charges, and his obligation is ordinarily a primary one."). The Court concluded, however, that the parties were free to contract over who would be responsible for payment of the tariff amount under the ICC policies then in effect, provided that they did so in a non-discriminatory manner. Id. at 65-66. In support, the Court cited an ICC bulletin which stated that its tariffs address only the amount of the freight charge and that it was up to the courts to determine who is responsible for the payment. Id. at 66 n.3. Then, after concluding that the shipper/consignor and the carrier were free to contract over the issue of liability for the tariff, the Court considered the language of the bill of lading that had been used, as

well as the other facts and circumstances, and concluded the trial court did not err in holding that the shipper/consignor had not agreed to assume the obligation to pay the tariff. Id. at 67-68. Arguably, the Court's conclusion about the freedom of the parties to contract over liability for the tariff amount was a change from its earlier cases, but this may have simply been a reflection of a change in the regulatory regime.[4]

Finally, the Court in Louisville & N.R. Co. rejected the argument that the trial court had erred in not concluding the shipper/consignor was secondarily liable, stating:

> The [trial] court might have concluded that it [the shipper] guaranteed merely that the consignee or his assign would accept the shipment. For, under the rule of the Fink Case, if a shipment is accepted, the consignee becomes liable, as a matter of law, for the full amount of the freight charges, whether they are demanded at the time of delivery, or not until later. His liability satisfies the requirements of the Interstate Commerce Act[.]

Id. at 70. Although some courts have read the foregoing passage to mean that a consignee becomes liable for the freight charges as a matter of common law upon acceptance of the goods - often focusing only upon the second of the three sentences, arguably, the Court was doing nothing more than reciting the strict statutory liability imposed by Fink for payment of the tariff. In other words, the court did not address the liability of the consignee when the consignor had agreed with the carrier to pay the freight charges and the consignee had not.

### b. The case law since the filed-tariff cases

There are a number of cases where courts have held or suggested in *dicta* that a consignee is liable for freight charges upon acceptance of goods shipped in interstate commerce as matter of federal common law based on the Fink line of cases. E.g., Harms Farms Trucking v. Woodland

---

[4] In any event, the Court's conclusion that the parties were free to contract is relied upon by latter lower court holding that the same freedom of contract extends to a carrier agreeing not to look to the consignee for payment. This point is addressed in more detail later.

Container, No. 4:05cv3185, 2006 WL 3483920 (D. Neb. Nov. 30, 2006); <u>C.F. Arrowhead Servs., Inc. v. AMCEC Corp.</u>, 614 F. Supp. 1384, 1387-88 (N.D. Ill. 1985) (noting the "somewhat questionable lineage" of the rule given the actual holdings in the <u>Fink</u> lines of cases and subsequent regulatory changes but accepting it given the weight of authority and citing cases). There are also a number of decisions where the rule of consignee liability upon acceptance is recited, but it is difficult to determine whether the liability being imposed was pursuant to a federal common law rule or deemed to be required by the regulatory regime then being enforced by the ICC, or its replacement, the Surface Transportation Board, including language in uniform bills of lading prescribed by regulation or administrative decision. <u>See</u>, <u>e.g.</u>, <u>CSX Transp. Co. v. Novolog Bucks Cnty.</u>, 502 F.3d 247, 254-55 (3d Cir. 2007) ("The second [well-established principle] is that the consignee becomes a party to the transportation contract, and is therefore bound by it, upon accepting the freight; thus it is subject to liability for transportation charges even in the absence of a separate contractual agreement or relevant statutory provision.") (citing the second sentence from the quotation set forth above from <u>Louisville & N.R. Co.</u> <u>supra</u>, but also referencing the current statutory requirements regarding consignee liability for rail shipments).

A number of other courts, however, have read the <u>Fink</u> line of filed-tariff cases more narrowly and have either held or suggested that consignee liability for freight charges for interstate shipments is simply a matter of contract in the absence of a federal statute, regulation, or administrative decision, including those governing federal tariffs. <u>Canadian Nat. Ry. v. Vertis, Inc.</u>, 811 F. Supp. 2d 1028, 1037-38 (D.N.J. 2011) (concluding that federal common law consignee liability did not exist outside the ambit of the Interstate Commerce Act); <u>Fikse & Co. v. U.S.</u>, 23 Cl. Ct. 200, 202-204 (1991) (rejecting contention that a consignee's acceptance of the shipment by itself

creates an express or implied obligation to pay the freight charges); <u>E.W. Wylie Corp. v. Menard, Inc.</u>, 523 N.W.2d 395, 398-99 (N.D. 1994) (narrowly construing the <u>Fink</u> line of cases, concluding that liability for payment of freight charges is largely a matter of contract, and holding that any common law presumption about liability which may exist can be rebutted by evidence that the parties intended something else and has no application where there is an express contract).

Consistent with the latter line of decisions are a number of motor carrier cases decided since the last round of motor carrier deregulation in 1995, holding that carrier actions to collect unpaid freight charges from consignors or consignees present only state law claims for breach of contract where there is no required tariff. <u>E.g.</u>, <u>Gaines Motor Lines, Inc. v. Klaussner Furniture Indus., Inc.</u>,734 F.3d 296, 302-07 (4th Cir. 2013) (action against a consignor) ("<u>Gaines Motor Lines</u>"); <u>Evans Transp. Servs., Inc. v. Northland Servs., Inc.</u>, No. C11–1713MJP, 2012 WL 727019, at **2-3 (W.D. Wash. Mar. 6, 2012) (action against a consignee); <u>GMG Transwest Corp. v. PDK Labs, Inc.</u>, No. CV 07–2548, 2010 WL 3710421, at ** 2-3 (E.D.N.Y. Aug. 12, 2010); <u>Con-Way Transp. Servs., Inc. v. Auto Sports Unlimited, Inc.</u>, No. 1:04-cv-570, 2007 WL 2875207, at *7 (W.D. Mich. Sept. 28, 2007); <u>Transit Homes of Am., Division of Morgan Drive Away, Inc., v. Homes of Legend, Inc.</u>, 173 F. Supp. 2d 1185 (N.D. Ala. 2001). In many of these cases, including the recent 2013 decision by the Fourth Circuit in <u>Gaines Motor Lines</u>, courts have dismissed federal actions commenced by carriers to collect the unpaid freight charges for lack of subject matter jurisdiction where, unlike in this case, diversity jurisdiction was not claimed or there was no grounds for it. And, while the holdings of all of these cases implicitly suggest the lack of consignee liability arising out of federal common law, several of the cases explicitly make reference to the <u>Fink</u> line of cases and note their

inapplicability based on the lack of a federal tariff.  See, e.g., Gaines Motor Lines, 734 F.3d at 302;

Transit Homes of Am., 173 F. Supp. 2d at 1189-90.[5]

Finally, there are other decisions that are unclear as to whether what is being applied is a

federal common law rule of consignee liability upon acceptance of goods or simply a more specific

application of contract principles.  For example, there are decisions which hold or suggest that

acceptance of goods by a consignee is an indication of an implied agreement to pay the freight

charges but are unclear whether the implied agreement arises as a matter of law or simply by the

conduct of the parties.  See, e.g., States Marine Intern., Inc. v. Seattle-First Nat. Bank, 524 F.2d 245,

247-48 (9th Cir. 1975); see generally 17 C.J.S. Contracts § 6 (database updated June 2014)

(discussing types of implied contracts).[6]  Somewhat similarly, there are also decisions which suggest

that consignee liability upon acceptance arises as matter of custom or industry practice.  E.g., Illinois

Cent. R. Co. v. South Tec Dev. Warehouse, Inc., 337 F.3d 813, 820 (7th Cir. 2003) ("Liability for

freight charges may be imposed only against a consignor, consignee, or owner of the property, or

others by statute, contract, or prevailing custom.") (internal quotation and citing authority omitted);

Middle Atlantic Conference v. U.S., 353 F. Supp. 1109, 1118, 1120 (D.D.C. 1972) (three-judge

---

[5]  In Gaines Motor Lines, the Fourth Circuit also rejected arguments for jurisdiction based upon the statutory provisions of the ICCTA, including 49 U.S.C. 13706 defining consignee liability, which the court held inapplicable because it presumably applies only where a federal tariff is required and because the federal regulations in any event so limit its applicability.  734 F.3d at 305-06. The court also rejected the argument that Congress had preempted the field with the adoption of the ICCTA, concluding that "the ICCTA 'contains no hint' that Congress intended federal courts to adjudicate this category of contract disputes based on federal common law . . . ."  Id. at 307 (quoting American Airlines, Inc., v. Wolens, 513 U.S. 219, 232 (1995)).

[6]  If state law applies, North Dakota's law, for example, appears to be:  (1) implied-in-fact agreements arise out of the conduct of the parties with the court having to determine from the surrounding circumstances what the intent of the parties was; (2) an implied-in-law contract (sometimes referred to as a quasi-contract) is a legal fiction used to support a claim of unjust enrichment when no contract exists; and (3) there cannot be an implied-in-law contract when there is either an express or an implied-in-fact contract relating to the same subject matter because they are mutually exclusive.  E.g., Lord & Stevens, Inc. v. 3D Printing, Inc., 2008 ND 189, 756 N.W.2d 789, ¶¶ 8-14.

panel); see Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co., 513 F.3d 949, 954-56 (9th Cir. 2008) (referencing "default standards" of consignor and consignee liability when an industry standard bill of lading is used).[7]   The distinction between whether federal common law is being applied or simply a more specific application of contract principles is of particular import with respect to whether federal or state law applies - particularly in the absence of a federally-established tariff.

   c.   **The court need not decide now whether federal common law applies**

The parties have not cited to any Eighth Circuit cases that provide definitive guidance with respect to (1) whether there is a federal common law rule governing consignee liability for interstate shipments or whether it is simply a matter of contract in the absence of an applicable federal statute or regulation,[8] and (2) whether federal or state law governs - particularly in the case of motor carrier shipments for which no federal tariff is required.  While the court believes at this point that the cases concluding that state contract law applies are the more persuasive - at least when there is no federal tariff, a final decision need not be made now and the parties may further brief the issue in their pretrial briefs.

There are two reasons why the court need not decide now whether federal common law applies in resolving Western's pending motion.  The first is that, even if there is a federal common

---

[7]   In the contract setting, custom and usage must usually be proved if contested, although in some cases taking judicial notice may be appropriate. Also, some demonstration that the party against whom custom or usage is asserted is chargeable with knowledge of it may be required.  Finally, custom and usage cannot be used to vary the meaning of contract language that is otherwise clear and unambiguous.  See generally 21A Am. Jur. 2d Customs and Usages §§ 2-3, 17-20, 30 (database updated May 2014);  E. Allan Farnsworth, Farnsworth on Contracts § 7.13 (3d ed. 2004).

[8]   One pre-Fink case would suggest that it is simply a question of contract.  Union Pac. R. Co. v. American Smelting & Refining Co., 202 F. 720 (8th Cir. 1912).

law rule that consignees are liable for the freight charges upon acceptance of the goods as a general matter, the prevailing view is that the parties involved in the transportation arrangement are free to contract among themselves as to the liability for the freight charges and this includes a carrier agreeing not to look to the consignee for payment - at least absent a federal statute or regulation to the contrary.  See, e.g., C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc., 213 F.3d 474, 478-79 (9th Cir. 2000); In re Roll Form Prods., Inc., 662 F.2d 150, 154 (2d Cir. 1981);  E.W. Wylie Corp. v. Menard, Inc., 523 N.W.2d at 398-99; cf., Louisville & Nashville R. Co. v. Cent. Iron & Coal Co., 265 U.S. 59, 66 (1924).

In this case, given the language that Western used in its bills of lading and the manner in which they were completed, there appears to be a fact issue as to whether Western had agreed to look exclusively to the payor, Stone Creek, for payment.[9]  As noted earlier, each of the bills provided spaces for indicating who would be making payment and, in each of the bills, the space provided for collection from the consignee was left blank and the space for billing the payor (i.e., Stone Creek) was filled in with the amount that Western claims is the freight charge.  Arguably, this could be viewed as suggesting that Western had agreed to seek payment for the freight charges only from the Stone Creek.[10]  In addition, what might also support this conclusion is the fact the bills of

---

[9]  In addition, the language of the bills and the manner in which they were completed suggest the possibility of an additional and possibly more general agreement between Western and Stone Creek with respect to payment of the freight charges.  No such agreement has been presented here, but, if there is one, it may have a bearing on the outcome of the case.  See, e.g., Canadian Nat. Ry. v. Vertis, Inc., 811 F. Supp. 2d at 1034; Jackson Rapid Delivery Serv., Inc. v. Thomson Consumer Electronics, Inc., 210 F. Supp. 2d 949,  953-54 (N.D. Ill. 2001); see generally Goods in Transit §§ 2.01, 2.02, 6.00, & 22.01-22.04.

[10]  As noted earlier, the boxes immediately below were only partially completed.  The "shipper" did not sign the non-recourse provision.  Also, the box where the words "Collect," "Prepaid Charge," or "Collect Prepaid Charge" (depending upon how the form is read) is not completed (assuming that it could be).  The box immediately below that is filled in with the words "Purchase Order," and whether that relates to the box just mentioned is unclear. The significance of these points, if any, is not immediately obvious.

lading are very specific in terms of assigning liability. As noted earlier, in addition to the foregoing provisions for payment of the freight charges, all of the bills of lading provide in capital letters that: "PAYOR IS LIABLE FOR ALL TIRES, TUBES, MECHANICAL FAILURES AND/OR STRUCTURAL DEFECTS." There is no suggestion on the face of the bills that the consignee would be charged for this liability.[11]

---

[11] In making its motion for summary judgment, Western provided only the front page of the bills of lading, but, when the court pointed out this deficiency during the hearing on the pending motions, Western filed a copy of the "boilerplate" it claims was on the back of each of the bills. Notably, one of the paragraphs reads as follows:

Section 7. The owner or consignee shall pay the advances, tariff charges, packing and storage, if any, and all other lawful charges accruing on said property, but except in those instances where it may be lawfully authorized to do so, no carrier shall deliver or relinquish possession at destination of the property covered by this Bill of Lading until all tariff rates, and charges thereon have been paid. The consignor shall be liable for the advances, tariff charges, packing, storage and all other lawful charges except that if the consignor stipulates, by signature, in the space provided for the purpose on the face of the Bill of Lading, that the carrier shall not make delivery without requiring payment of such charges and the carrier, contrary to such stipulation, shall make delivery without requiring such payment, the consignor (except as hereinafter provided) shall not be liable for such charges. Provided that the carrier has been instructed by the shipper or consignor to deliver said property to a consignee other than the shipper or consignor, such consignee shall not be legally liable for transportation charges in respect of the transportation of said property (beyond those billed against him at the time of delivery for which he is otherwise liable) which may be found to be due after the property has been delivered to him, if the consignee (a) is an agent only and has no beneficial title in said property and (b) prior to delivery of said property has notified the delivering carrier in writing of the fact of such agency and absence of beneficial title, and in the case of a shipment reconsigned or diverted to a point other than that specified in the original Bill of Lading, has also notified the delivering carrier in writing of the name and address of the beneficial owner of said property, and in such cases the shipper or consignor, or in the case of a shipment so consigned or diverted, the beneficial owner, shall be liable for such additional charges. If the consignee has given to the carrier erroneous information as to who the beneficial owner is, such consignee shall himself be liable for such additional charges. Nothing herein shall limit the right of the carrier to information as to who the beneficial owner is, such consignee shall himself be liable for additional charges. Nothing herein shall limit the right of the carrier to require at the time of shipment the prepayment of the charges. If upon inspection it is ascertained that the articles shipped are not those described in the Bill of Lading, the advances or tariff charges must be paid upon the articles actually shipped.

(Doc. No. 44-1). If this language was somehow dispositive, Western surely would have presented and argued it in its motion. That being said, Western has failed to demonstrate there is any tariff to be collected, which appears to be the principal focus of the section given the specific reference to "tariff charges." Cf. Illinois Steel, 320 U.S. at 510-12 (deciding the liability of a consignor under a similar version of "Section 7" in a uniform bill of lading prescribed by the ICC for use by rail carriers to ensure payment of the tariff and noting the liability of the consignee under the section). In addition, even if the section is broader and includes freight charges in the absence of a tariff, it could be construed as simply being a default provision that would apply when there is no specific agreement to the contrary, i.e., it could be trumped by what is set forth on the face of the bill of lading or in some other agreement. There may also be other plausible constructions. See, e.g., C.F. Arrowhead Services, Inc. v. AMCEC Corp., 614 F. Supp. 1384, 1386 (N.D. Ill. 1985) (construing similar language to impose liability upon a consignee only if demand is made for payment by the

(continued...)

The second reason why the court need not decide now whether federal common law applies is because most of the courts holding that consignees are liable as a matter of federal law for freight charges upon the acceptance of the goods recognize an exception (even in cases where there is a governing federal tariff ) when a consignee has relied upon a carrier's representation that it would not be looked to for payment of the freight charges and imposition of liability would result in "double payment" by the consignee. S. Pac. Transp. Co. v. Campbell Soup Co., 455 F.2d 1219, 1222 (8th Cir. 1972) (citing other cases); Consol. Freightways Corp. of Del. v. Admiral Corp., 442 F.2d 56, 59-62 (7th Cir. 1971); see S. Pac. Transp. Co. v. Commercial Metals Co., 456 U.S. 336, 351 (1982) ("Commercial Metals") (discussing the cases but concluding they did not apply in that case). Western argues this exception is very narrow and is limited only to those instances when the bills of lading have been marked "prepaid." However, while that may be the fact pattern of most of the cases, the court is not able to discern from the cases a reasoned basis for limiting the exception to only where the bills have been marked "prepaid" - particularly when there is no tariff to protect. In other words, the court does not believe there is a principled difference between a consignee being lead to believe the carrier would not look to it for payment based on the bill of lading having been marked "prepaid" and a consignee being lead to believe it would not be looked to for payment based on other language in the bill that conveys the same message, which may be the case here. In fact, the Supreme Court, in discussing the "double payment" line of cases in Commercial Metals, suggested as much when it stated:

> To be sure, these ["double payment'] cases speak in equity terms. But none of these cases turned solely on a carrier's violation of credit regulations. Each and all of them

involved a carrier's misrepresentation, such as a false assertion of prepayment on the bill of lading, upon which a consignee detrimentally relied only to find itself later sued by the carrier for the same freight charges. We find that these double payment cases constitute their own category and stand against the placement of duplication of liability upon an innocent party.

456 U.S. at 351.

As for the remainder of the elements that may be required to establish the "double payment" exception, Hexco has presented evidence indicating it would suffer double payment - at least to the extent of the $7,000.00 per modular home it claims was paid to Stone Creek by its financing lessor. Also, there is evidence that Hexco may have relied upon the language of the bills of lading to its detriment. That is, assuming Hexco was properly presented with the bills of lading, one of the options it had was not accepting the shipments of the modular homes if it understood that Western may be looking to it for payment of the freight charges. E.g., C.F. Arrowhead Servs., Inc. v. AMCEC Corp., 614 F. Supp. at 1388.[12]

In summary, the court concludes there are triable issues as to whether Western affirmatively agreed to look only to Stone Creek for payment and, in the alternative, the applicability of the "double payment" exception if federal common law imposes liability upon consignees upon acceptance of the goods as a general matter. For these reasons, the court denies Western's motion for summary judgment based on it claim that Hexco became liable upon acceptance of the modular homes irrespective of the particular facts and circumstances.

_____

[12] Hexco also seeks to invoke the exception based upon a purported oral representation made by one of Western's drivers that Western was not looking to Hexco for payment of the freight charges. The court expresses no judgment at this time whether this would be sufficient to satisfy the exception. However, the court notes that Western's drivers may have been vested with actual or apparent authority to bind Western since its printed bill of lading form appears to authorize its drivers to sign on its behalf. See C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc., 213 F.3d at 480-81 (concluding that there was sufficient evidence that the motor carrier's drivers were vested with ostensible authority to bind the carrier based in part on the fact that the drivers executed bills of lading on behalf of the carrier).

### III. <u>MOTION TO DISMISS FOR FAILURE TO JOIN AN INDISPENSABLE PARTY</u>

Hexco moves for summary judgment of dismissal, claiming that Stone Creek is an indispensable party within the meaning of Fed. R. Civ. P. 19(a) and that this action must be dismissed because of Western's failure to join Stone Creek. The court disagrees. The court can award complete relief as to the present parties to the extent permitted by law without Stone Creek being a party.[13] Further, any award of relief to Western would not expose Hexco to a *future* risk of double payment to Stone Creek. And, to the extent an award would result in double payment having been made because of what has already been paid to Stone Creek, Hexco can argue this as a defense to the extent it is permitted by law without Stone Creek having been made a party.[14]

### IV. <u>ORDER</u>

Based on the foregoing, Western's motion for summary judgment (Doc. No. 21) is **DENIED** and Hexco's motion to dismiss for failure to join an indispensable party (Doc. No. 34) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 27th day of June, 2014.

<u>/s/ Charles S. Miller, Jr.</u>
Charles S. Miller, Jr., Magistrate Judge
United States District Court

---

[13]   This is particularly true if the federal common law principles advocated by Western apply.  <u>See</u> <u>Southern Ry. Sys. v. Leyden Shipping Corp.</u>, 290 F. Supp. 742, 744 (S.D.N.Y.1968) (concluding that the consignor, even though primarily liable for the freight charges, was not an indispensable party within the meaning of Rule 19 in an action by the carrier against the consignee because the liability of the consignee was independent of that of the consignor).

[14]   To the extent Hexco believes it is entitled to indemnity from Stone Creek if it is held liable to Western, it could have attempted to implead Stone Creek.  Also, it presumably could have asserted a separate action and still may be able to do so - at least as a theoretical matter.  Finally, if the court is wrong about its conclusion that Stone Creek's joinder was not required under Rule 19(a), Hexco does not appear to dispute Western's contention that Stone Creek has gone bankrupt (making collection against it now difficult both legally and as a practical matter), and the same reasons expressed above support denial of Hexco's motion under Fed. R. Civ. P. 19(b).